IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

vs.                                    Case Nos.:  3:13cr77/LAC/EMT
                                                  3:16cv593/LAC/EMT

JOHN NORMAN SIMS

---

## **REPORT AND RECOMMENDATION**

This matter is before the court upon John Norman Sims' "Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" (ECF No. 212).   The Government responded (ECF No. 228, 229), and Sims filed a reply (ECF No. 236).   The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.   *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).   After reviewing the record and, on September 18, 2017, conducting an evidentiary hearing, the undersigned now recommends that Sims' motion be granted to the extent that he be allowed to withdraw his guilty plea to Count 34 of the indictment, subject to the Government's right to proceed against him on this count.

## PROCEDURAL BACKGROUND

On July 23, 2013, John Norman Sims was charged in the following counts of a 34-count indictment:

**Count 1**: Conspiracy to Commit Bribery, Theft of Government Funds, Disclosing or Obtaining Contractor Bid or Proposal Information of Source Selection Information, Honest Services Mail Fraud, and the Making of False Statements within the Jurisdiction of the Executive Brand of the U.S. Government, between February 2007 and June 2010, in violation of 18 U.S.C. §§ 371 and 1349;

**Count 3**:   Bribery, between December 2005 and May 2009, in violation of 18 U.S.C. § 201(b)(1)(B);

**Count 5**:   Bribery, between August 2007 and October 2007, in violation of 18 U.S.C. § 201(b)(1)(B);

**Counts 7–11**:   Theft of Government Property in violation of 18 U.S.C. §§ 641 and 2;

**Counts 12–18**: Disclosing or Obtaining Contractor Bid or Proposal Information or Source Selection Information, on seven dates certain, in violation of 41 U.S.C. § 423 and 18 U.S.C. § 2;

**Counts 19–23**:   Scheme or Artifice to Commit Mail Fraud, on five dates certain, in violation of 18 U.S.C. §§ 1341, 1346, and 2;

**Count 24**: Money Laundering in or about December 2005 and in or about May 2009 in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (B)(i) and 1956(h);

**Counts 25, 30, 32**: Making False Statements within the Jurisdiction of the Executive Branch of the Government of the United States, on three dates certain, in violation of 18 U.S.C. § 1001; and

**Count 34**:   Possession or Retention of Information Relating to the National Defense,[1] between on or about August 6, 2008, and on or about March 24, 2012, in violation of 18 U.S.C. § 793(e).

---

[1] Although otherwise described in the documents in this case, the statutory heading is "Gathering, transmitting or losing defense information."   18 U.S.C. § 793.

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

(ECF No. 3; ECF No. 145).

Sims retained attorney James Van Camp of North Carolina as well as local counsel John Beroset to represent him.    On July 7, 2014, he pleaded guilty pursuant to a written plea agreement to Counts One (Conspiracy), Three (Bribery), Nine (Theft of Government Property), Sixteen (Disclosing or obtaining contractor bid or proposal information or source selection information), and Thirty-Four (Possession or retention of information relating to the national defense) (ECF Nos. 105–108). The plea agreement provided that the Government would move to dismiss the remaining counts against him at sentencing.    Additionally, the agreement "specifically exclude[d] and d[id] not bind any other . . . federal agency . . . from asserting any civil, criminal, or administrative claim against the Defendant" (ECF No. 107 at 1).

At the plea colloquy the court asked Sims whether he had reviewed the Statement of Facts and whether the facts contained therein were true and correct (ECF No. 217 at 8–9).    Sims acknowledged he had carefully reviewed the document and that the facts set forth therein were true and correct.    The court explained the possible penalties Sims faced, including a term of supervised release, and that his sentence could not be predicted (ECF No. 217 at 9–12).    Sims

acknowledged his signature on the plea agreement and supplement thereto, and the

fact that he had reviewed the agreement in careful detail with counsel (ECF No. 217

at 12).    The following exchange then took place:

> THE COURT:    And does this document contain all of the promises and all
> of the agreements that you feel you have with anyone that causes you to enter
> the plea here today?
>
> THE DEFENDANT:    I believe it does, Your Honor.
>
> THE COURT:    All right.    So there are no secret or undisclosed promises or
> agreements?
>
> THE DEFENDANT:    Absolutely not.
>
> THE COURT:    All right.    And do you understand that this is an agreement
> between you and the Government and is not binding on the Court in any way.
> The Court does reserve the right to impose any sentence that might be lawful
> and proper in your case.
>
> THE DEFENDANT:    I understand.    Yes, Your Honor.

(ECF No. 217 at 12–13).    Sims responded in the affirmative when the court asked

whether he had sufficient time to discuss his case with his attorneys (ECF No. 217

at 14).    When the court asked if he was satisfied with the representation they had

provided to him, Sims responded that "[t]he representation has been stellar, Your

Honor.    Thank you." (ECF No. 217 at 15).    The court then asked Sims whether he

had any questions about anything that had been discussed or any of the court's

questions, and whether he wanted to change, add to, or modify any of his answers (*id.*).    Sims responded "No, Your Honor" and thanked the court for its patience (*id.*).    At no time did he indicate that he had any questions about the penalties he faced, and neither he nor his attorneys broached the subject of his retirement pay.

The Presentence Investigation Report ("PSR") calculated that Sims had a total offense level of 30 and a criminal history category of I (ECF No. 145, PSR ¶¶ 87–108, 111–112).    The applicable guidelines range of 97 to 121 months was limited, as to Count 16 only, to 60-months imprisonment due to the application of a statutory maximum (ECF No. 145, PSR ¶¶ 157–158).

On October 28, 2014, after expressly stating that it had taken into account all of the factors enumerated by 18 U.S.C. § 3553(a), the court sentenced Sims to concurrent below-guidelines terms of 36-months imprisonment on each count, followed by three years of supervised release (ECF Nos. 154, 170, 171).    Sims did not appeal, and he began to serve his sentence on January 28, 2015 (ECF No. 187).

Sims filed the instant motion to vacate pursuant to the prison mailbox rule on October 18, 2016 (ECF No. 212).[2]    The lone ground for relief is that counsel

_____

[2] Sims was released on August 18, 2017, during the pendency of this § 2255 action.

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

provided constitutionally deficient representation as it related to Sims' decision to enter a guilty plea to Count 34.    Sims claims that his retained attorneys' affirmative misadvice regarding the consequences of a conviction under 18 U.S.C. § 793(e) rendered his plea involuntary and unintelligent as to that count.    He also alleges in his memorandum that counsel failed to investigate and provide accurate advice about the potential loss of retirement and related benefits that would flow from a conviction of this offense.

Before the instant prosecution, Sims had retired honorably from the United States Air Force and was receiving approximately $3,500 per month in military retirement pay, as well as full health insurance benefits for his family (ECF No. 212 at 12).    He states in his motion that he asked his attorneys whether pleading guilty would, or could, cause the forfeiture or termination of his military retirement pay and benefits.    He states he was informed that it would not (ECF No. 212 at 12–13).    Sims also maintains that Mr. Van Camp relayed to him that AUSA Stephen Kunz had indicated that the Government "would not be going after [his] retirement" (ECF No. 212 at 13).    Sims asserts that the advice provided by his, which led him to accept the plea offer, was plainly wrong.    He further claims that if he had been correctly advised about the ramifications of his plea, he would not have pled guilty

to this charge, because it was important to him to maintain his retirement and medical benefits.

The Government opposes the motion claiming in turn that (1) the motion is untimely; (2) a lack of advice about collateral consequences of a plea does not render the plea uninformed or involuntary; and (3) Sims cannot show prejudice (ECF No. 228 at 2–4).[3]

The undersigned held an evidentiary hearing on September 18, 2017. Assistant Federal Public Defender Tom Keith represented Defendant at the hearing. Assistant United States Attorney Andrew Grogan, who prepared the Government's response to the § 2255 motion but was not the attorney who prosecuted the case, appeared on behalf of the Government.    At the conclusion of the hearing, the court asked the parties if they wanted to submit argument on the issue of the appropriate remedy if the court were to grant relief on Sims' claim, or any other supplemental briefing as a result of the hearing (ECF No. 250 at 226).    The parties' submissions,

---

[3] With respect to the latter defense, the Government asked that the court hold an evidentiary hearing after the Supreme Court's decision in *Lee v. United States*, 16-327.   The *Lee* Court held on June 23, 2017, that providing affirmative misadvice about the collateral consequences of a plea, (in that case mandatory deportation), can be constitutionally ineffective if it results in the defendant being denied an entire judicial proceeding to which he had a right.   *Lee v. United States*, 137 S. Ct. 1958 (2017) (also finding that a defendant with no viable defense can still show prejudice, noting that when the consequences of a conviction are dire, even the smallest chance of success at trial may look attractive).

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

limited to the question of the appropriate remedy, are now part of the record (ECF Nos. 247, 248).

The Evidentiary Hearing[4]

At the hearing, the defense first presented brief testimony from three of Sims' friends to whom he had made comments about his retirement pay or benefits. Robert Morton Miller testified that Sims told him that Sims' wife would still receive his military benefits.  Therefore, Miller was surprised to hear that Sims' benefits had ceased, once this occurred.  Sims never told him that this was contrary to what his attorneys advised.

Marie Ulrich testified that Sims told her he was concerned about the loss of retirement income, but his attorneys had advised him that the Government was not going after his retirement.  Ulrich did some "open source research" for Sims regarding the potential loss of his retirement benefits before he entered his plea. She stated that she did so because Sims was ill from his prostate cancer treatments. In response to the court's question about why such research was necessary if Sims' lawyers had told him he would be fine, Ulrich testified that it was Sims' nature to

---

[4] The court ordered a copy of the hearing transcript after neither party did so (ECF Nos. 249, 250).

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

want as much information as he could find.    She denied having received the impression that Sims did not trust his lawyers.

William Patrick Lawson testified telephonically that he spoke with Sims before trial, and Sims indicated that he believed he would receive his military pension, but not his disability, during incarceration.    Sims also stated he was relying on his retirement income to provide partially for his family while he was in prison.    In light of the forced sale of the family's primary residence, Sims rented a house from Lawson for his wife to live in during his incarceration.    Lawson testified that he had been confused about how Sims would be able to pay for it until it became clear that a military pension would help cover his costs.

Sims' parents, Eleanor and Colonel Johnny Norman Sims Sr., also testified. Mrs. Sims recalled that their son had come to visit around June 11 or 12, 2014, and they had talked about his case.    She testified that, as retired military personnel, she and Sims' father were concerned about their son's medical benefits and his retirement.    Sims told his parents that his lawyer had advised that his retirement would not be affected.    Mrs. Sims said she believed that it was Mr. Van Camp who had provided this advice.    As a result, they were shocked when Sims' wife (Kathy Sims) called them, hysterical, after the benefits were discontinued.    In speaking

separately with her son and his wife afterward, she did not recall Sims blaming his lawyers, but she testified that Kathy Sims said words to the effect that she "can't believe this has happened when they told him it wasn't going to happen" (ECF No. 250 at 45, 46).

Colonel Sims testified that when his son came to visit June 11–12, 2014, one month before his plea, the elder Sims asked whether the case would affect his military retirement or Tricare.   His son responded that, according to his lawyers, his retirement and health benefits would not be affected in any way.    The elder Sims also testified that Sims told him that his lawyer had said that the prosecutor said that they were not going after his retirement.    Colonel Sims testified that he was under the impression that it was Van Camp who had made this statement.    He elaborated that he believed the reason Sims had two lawyers was because he needed a Florida lawyer too, and that Van Camp was the primary lawyer on the case.

Sims' daughter, Kristin Nicole Sims, testified that she recalled her father stating that his attorney had told him that his retirement would be safe and that was the one thing they had going for them.    Ms. Sims said her father did not specify which attorney had advised him of such.    She further stated that her father repeated

this multiple times throughout the process, reiterating words to the effect that "at least we have that."

Mrs. Katherine "Kathy" Sims (Defendant Sims' wife) testified that she had been a school teacher for 22 years.   Because the family had moved around for her husband's career, she did not have her own retirement benefits.   Mrs. Sims recalled many conversations about her husband's military retirement and health care.   She was concerned because they had to sell their home and use retirement savings to pay for lawyers.   Mrs. Sims recalled learning from her husband about what had transpired during a meeting Van Camp had with AUSA Kunz.   Her husband told her that when Van Camp got out of the meeting with Kunz he said that the Government had a really good case, but the good news was that the Government would not be going after their retirement.   Mrs. Sims described this news as a huge relief given the uncertainty of their situation.   The health benefits and retirement were a comfort because when she and her husband could be back together they could rebuild their lives with the retirement.

Mrs. Sims testified that both she and her husband attended a meeting with Van Camp where they discussed the Sentencing Guidelines.   She said that she could remember leaving the meeting knowing that her husband was going to prison, but

that they had the retirement.    Mrs. Sims did not recall anything that was specifically stated during the meeting, only that when she left there she felt she did not have to worry about the retirement (ECF No. 250 at 77).    Mrs. Sims further testified that when the retirement benefits ceased some months after her husband's incarceration, Mrs. Sims talked to both lawyers, whom she described as "shocked" because they had no idea this was coming (ECF No. 250 at 81).    She even called AUSA Robert Wallace, from Washington D.C., who had been involved in the case.    Mrs. Sims recalled that the lawyers speculated that perhaps the benefits stopped during the pendency of Sims' incarceration, but they really did not know what happened or what to do.

Mrs. Sims then contacted the military.    She spoke to a Colonel Mitchell to whom Mr. Beroset later wrote an email on Sims' behalf.    She said that Mr. Van Camp also sent a letter to a different Colonel in an attempt to get Sims' retirement reinstated.    Mrs. Sims was asked on cross-examination why neither her comments to her mother-in-law nor her emails to Beroset referenced what the lawyers had allegedly told them about the security of the retirement.    She explained that at the time she thought the Government was just stopping it because her husband was incarcerated, and that this was the result of "the Government."

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

Defendant Sims was the last defense witness.   He recalled that the first discussion of the retirement issue was when he met with Van Camp in Charleston, South Carolina, and Van Camp asked if Sims had retirement.   Sims also testified that the first time he and his lawyers were allowed into the classified facility,[5] that Beroset asked Sims if the case would affect his retirement (ECF No. 250 at 97). Sims responded that he hoped that it would not, and Van Camp adamantly stated that they needed to remember to look into this.   One of the attorneys, he did not recall which one, suggested that Sims contact Air Force personnel for assistance. Sims said that other than researching online he did nothing, because he was told that no one in his Air Force program was supposed to talk to him about the case.

Sims testified that he made notes in preparation for a May 26, 2014 meeting with counsel, and among the areas of discussion he identified was the impact of a conviction on his military retirement pay and VA Benefits (Evidentiary Hearing ("E.H.") Defendant's Exh. 1 at 3).   Sims recalled that he told counsel that he wanted

---

[5] Due to the classified nature of the documents at issue in this case, a sensitive compartmented information facility, referred to as a "SCIF," was set up at the U.S. Courthouse in Pensacola for storage and review of documents in this case.   Review of documents and discovery took place only in the SCIF.

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

this issue addressed, and Van Camp assured him that it was a priority and they would not let it go.

Sims and Van Camp came to Florida for a June 10, 2014 status conference. The day before the conference, they reviewed the discovery for only the second or third time.   Sims recalled that Van Camp was not feeling well that week.   He testified that Van Camp fell asleep three times while they were going through the documents, and Sims had to wake him up (ECF No. 250 at 103).   Sims drove Van Camp to a meeting with AUSA Kunz.   Sims did not attend this meeting, but picked Van Camp up afterward.   Van Camp told Sims beforehand that the purpose of the meeting was to "find out what the Government really wants" (ECF No. 250 at 104). After the meeting, Van Camp reported to Sims that Kunz was confident that the Government had a strong case against him.   Van Camp advised Sims that the Government had created a notebook of evidence in support of its case for Van Camp to review, and that the Government was looking for prison time.   The good news however, according to Van Camp, was that the Government was not going after Sims' retirement. [6]   Sims recalled that Van Camp spontaneously shared this

---

[6] Sims clarified on cross-examination that he assumed that Kunz had relayed that information to Van Camp, although Van Camp did not expressly state that Kunz had used those words.   Sims testified, however, that it was clear from Van Camp's inflection and facial expression that his

information, rather than in response to a question (ECF No. 250 at 105).    The men went to dinner and Van Camp repeated the same words, that the Government was not going after Sims' retirement, but Sims did not recall Van Camp using those terms ever again.

Despite Van Camp's assurances, eight days later, on June 18, 2014, at 8:00 a.m., Sims emailed both Van Camp and Beroset requesting "a definitive answer regarding the impact of [sic] my federal Department of Defense retirement should I be found guilty" (E.H. Def's Exh 3).    Van Camp did not respond.    Beroset's response, at 11:52 a.m. on the same day, was "I do not feel comfortable giving you a definitive answer on your retirement question" (E.H. Def's Exh. 3 at 2).    Beroset indicated that he had spent some time on the web researching the issue, and he attached some "useful information," including a copy of 5 U.S.C. § 8312.    Beroset closed by saying that "[m]y concern is that you can find anything you want on the web," and he told Sims to contact him after reviewing the material.    Sims responded the following day at 10:02 a.m., copying both lawyers, stating "I need your assessment on this statute."    Sims re-attached what appeared to be the same copy of 5 U.S.C. § 8312 that Beroset had sent to him.    In his email, Sims said "It

---

retirement was not in jeopardy (ECF No. 250 at 126).

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

doesn't appear I'm being charged under 5 U.S. Code Section 8311-8322 . . . am I reading this correct?"[7]    He did not receive a response from either attorney.

Sims testified that the following week, on June 23, 2014, there was a meeting with Van Camp, Sims, and Mrs. Sims, to which Beroset may have called in telephonically.    Sims testified that he received the impression that Van Camp took offense at Sims asking questions (ECF No. 250 at 111).    Van Camp told Sims that if they were discussing military matters counsel would listen to Sims, but because "this" (criminal defense) was their area of expertise, he needed to listen to them. Sims asked Van Camp once again about his retirement and Van Camp said that Sims needed to trust him because they had found nothing that was going to affect his retirement (ECF No. 250 at 111–112).

Two weeks later, Sims entered his guilty plea.    He testified that there had been no additional discussion about the retirement because at that point he was comfortable with counsel's answers.    Sims recalled that he was focused on some

---

[7] Sims testified that he was not sure where the copy of the statute came from because both he and Ms. Ulrich were doing research.    He said that he could not recall if he read the attachments to Beroset's email before or after he sent his message.    The statute, 5 U.S.C. § 8312, in pertinent part provides that a person convicted of an offense within the purview of 18 U.S.C. § 793 "may not be paid annuity or retired pay on the basis of the service of the individual which is creditable toward the annuity or retired pay."    As noted above, Sims was charged in Count 34 with a violation of 18 U.S.C. § 793(e).

of the charges and that he perceived the statement of facts to be inaccurate (ECF No. 250 at 114).

Sims recalled that there were no red flags regarding his retirement at his October sentencing.[8]    Again, he described himself as focused on other matters. Of primary concern was that the Government had warned him that if he testified about "classified matters," they would pull the plea.    Sims said that he felt appalled that he was being threatened that he could not testify at his own trial and recalled Beroset saying something to the effect that the Government's threat was the "largest show of coercion that he had ever seen."

Sims reported to prison in January of 2015, and his benefits continued until November of 2015, when the expected deposit was not received.    When this first happened, because Sims had "zero indication" to expect it, he searched for the reason it had happened, thinking it was not permanent.    Sims testified that he did not find out until December of 2015 that his benefits had ceased in accordance with 5 U.S.C. § 8312; the official notification regarding the forfeiture of his retired pay was not written until August 3, 2016 (E.H. Def's Exh 5).

---

[8] Sims also notes that the PSR did not identify any denial of federal benefits flowing from the conviction (ECF No. 145, PSR ¶¶ 174, 175; ECF No. 212 at 26).

Sims acknowledged that there was no mention of his retirement or other benefits in the plea agreement, and that the agreement provided that it did not bind any other agency.   He admitted that he never expressly told his attorneys that he would not plead guilty if his retirement was affected, but more to the effect that he would fight if they came after his retirement (ECF No. 250 at 140).

Sims noted that he and the lawyers had discussed other military officers' cases involving mishandling of classified information, but only after he was convicted. For instance, they discussed General Petraeus, who was allowed to plead guilty to a misdemeanor after sharing classified documents with his mistress.   In contrast, Sims had not shared the documents with anyone.

At the conclusion of his re-direct testimony, Sims stated that if he had known that he was being charged with a charge tantamount to "espionage," he would have fought everything.   He also testified that he would have asked his attorneys to try to get the Government to agree to a plea of a lesser included misdemeanor charge, presumably such as was done in Petraeus' case.   Sims affirmed that he would have pleaded guilty to the counts he thought were commensurate with what he did, but not to the count of espionage and where he would have lost his retirement benefits (i.e., Count 34).

The Government presented the testimony of Sims' two former attorneys, and no other witnesses.   James Richard Van Camp testified that the subject of Sims' retirement did not come up in his initial meeting with Sims, and he appeared to state that it had not been mentioned by the time Van Camp met with AUSA Kunz in Tallahassee for the first time (ECF No. 250 at 160, 164).   Van Camp stated that the issue of Sims' retirement benefits did not come up in his first meeting with AUSA Kunz, or during any of his conversations with Kunz (ECF No. 250 at 164–165). Van Camp denied having related to Sims that the Government was not going after his retirement (ECF. No. 250 at 165-166).

Van Camp recalled that at one point when he, Sims, and Beroset were in the SCIF, he realized that the count dealing with classified information could affect Sims' retirement.   Van Camp said that he told Sims that this count—presumably Count 34—"did carry aspects of a retirement—forfeiture of retirement" (ECF No. 250 at 166).   At the time, Van Camp relayed to Sims that this was "a factor" that needed to be considered and reviewed, but he could not tell Sims what that factor would be.   Van Camp recalled that Beroset suggested that Sims get in touch with

the "Air Force retirement people" so he could find out about any consequences to a guilty plea.[9]

Van Camp testified that he recalled other discussions about Sims' retirement and that there was an email at some point in time in which Sims asked about his retirement (ECF No. 250 at 167).   However, when specifically asked about the email Sims had sent to him and Beroset, Van Camp said he did not recall receiving it (ECF No. 250 at 167).   Similarly, he did not recall receiving Beroset's response or Sims' follow-up question to Beroset's response, although he was copied on all of the emails.[10]   Van Camp admitted that he does not respond to emails and that his office practice is that his paralegal or assistant prints his emails and places them in a tray on his desk for him to review.   He also said that he did not recall any other discussions he had with Sims about his retirement pay prior to the guilty plea (ECF No. 250 at 168).

Van Camp testified that he tried to persuade the Government to reduce the number of charges to which Sims would have to plead guilty.   He recalled that at

---

[9] Van Camp's testimony was specifically about a guilty plea rather than more generally about a conviction.

[10] Van Camp also testified that he did not know of Beroset giving Sims any other advice on this issue other than what was in the email and telling Sims to look into it himself (ECF No. 250 at 174).

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

one point the Government wanted Sims to plead to eleven counts, but this was later reduced to five.   Van Camp remembered specifically asking that Count 34 not be one of the counts of conviction, and that Kunz rejected his request (ECF No. 250 at 169).   He was asked whether he had any reason to believe that Kunz would have allowed Sims to plead guilty to a lesser misdemeanor charge instead of Count 34, and Van Camp responded that Kunz stated he would not agree to any negotiation that did not include Count 34 as charged (ECF No. 250 at 169–170, 193–195).

Van Camp testified that Sims never said or gave any indication that he would not agree to a plea if his retirement would be affected (ECF No. 250 at 172).   Van Camp also denied hearing Sims say anything to the effect that he would fight really hard if he was concerned about losing his retirement pay.   However, he stated that obviously Sims was concerned about the retirement pay (ECF No. 250 at 172). Nonetheless, Van Camp's recollection was that despite having several meetings with Sims and his wife, the issue of retirement pay was not discussed until after sentencing (ECF No. 250 at 168, 172).

On cross-examination, defense counsel asked Van Camp if, in his opinion, the issue of military retirement was a large issue he would have wanted to discuss with his client.   Van Camp responded "[n]ot only want to, but I did" (ECF No. 250 at

176).   However, Van Camp noted that Beroset asked Sims to check into it "with somebody who might know in the Air Force" and that Sims "never mentioned it again" (ECF No. 250 at 177).   When asked if he or anyone in his office looked into the issue, Van Camp responded that Beroset provided Sims with some information (ECF No. 250 at 177–178).   He said that he recalled seeing the information, but not the "one-sentence emails," and that the information Beroset provided to Sims "spoke for itself" (ECF No. 250 at 178, 179, 180–181, 192).   Ultimately Van Camp stated that he did not do any research about the impact of Sims' conviction of Count 34 on his retirement benefits, and that the three men never talked about this issue (ECF No. 250 at 181–182).

Van Camp additionally testified that he did not think he said anything to reassure Sims that he would not lose his retirement.   He did not recall traveling to Pensacola and being ill or under the weather, as Sims had described, but readily stated that he could not say it had never happened (ECF No. 250 at 183–184).

Defense counsel asked Van Camp whether he was aware of ABA standards providing that defense counsel should advise their clients of collateral consequences of the plea (ECF No. 250 at 184).   Van Camp responded 'Yes, as I did" (ECF No. 250 at 184).   Mr. Keith pressed Van Camp on whether he had actually tried to

determine, learn about, and advise Sims of possible collateral consequences.    Van

Camp said "it was a factor," and he reiterated that Beroset sent Sims materials about

the issue, following which Sims never mentioned it again.    Van Camp recalled that

Sims' primary concern was how much time he would spend in prison (ECF No. 250

at 185–186).    When questioned if he felt he had an obligation as counsel to try to

find an answer to the question about the retirement benefits, Van Camp testified that

"I did at the time what I thought was effective counseling for my client based upon

all the responsibilities I had for him, including reviewing, analyzing, evaluating all

the discovery in a very complex logistical situation in a SCIF" (ECF No. 250 at 186).

Van Camp stated twice that he was not excusing anything and asked, rhetorically,

"does this excuse me for not talking about retirement?    No." (ECF No. 250 at 186–

187).    He also shifted responsibility to Sims by saying that Sims never mentioned

it afterward, that it was not a factor at sentencing, and that it was not something Sims

brought up thereafter (ECF No. 250 at 187, 194).    Ultimately Van Camp testified

that he raised the issue, he discussed the issue, and he believed that Sims was fully

aware that there was a "possible consequence to his retirement" (ECF No. 250 at

189).

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

Van Camp was questioned about a statement in a letter he wrote on Sims'
behalf in April of 2016 to the Air Force Personnel Center Judge Advocates (E.H.
Government's Exh. 6).    In this letter, Van Camp states "As counsel for Lt. Col. (R)
Sims, we did not believe that he would lose his retirement based upon the facts of
the case" (ECF No. 250 at 190; E.H. Government's Exh. 6 at 3).    Van Camp wrote
that the "facts of the case, prosecution testimony, and polygraph results simply do
not support this unwarranted and tragic consequence," and he closed by urging that
the Air Force exercise its discretion to reinstate Sims' retirement (E.H.
Government's Exh. 6 at 3, 5).    Van Camp admitted that the representation in the
letter regarding the potential discretion with respect to the retirement benefits was
based on his post-sentencing conversation with a lieutenant colonel in Texas, whose
name he could not recall (ECF No. 250 at 190–191).    When asked if he did any
research at the time he wrote the letter, or whether someone else had, Van Camp said
yes, and that he had looked at the statute but he could not say whether he did any
more research than that (ECF No. 250 at 192).

Van Camp testified that he understood Sims' main concern was how much
time he was going to spend in prison, which is consistent with the affidavit Van
Camp submitted in response to the § 2255 motion (ECF No. 229-1 at 6).    He

acknowledged that Sims' retirement was a factor, but maintained that Sims wanted to enter a plea that would give him the least amount of time possible.   Van Camp said "If you are asking me would Col. Sims have pled not guilty to all these things because of retirement, I believe not, based upon the conversations I had" (ECF No. 250 at 193).

The undersigned inquired directly of Van Camp about the reason he specifically asked AUSA Kunz to drop Count 34 as part of the plea negotiations (ECF No. 250 at 194–196).   Van Camp seemingly vacillated between admitting that he knew that the retirement issue was involved only with this count, and saying that it was his understanding that Sims never had any intent to possess the classified information—when he was told to leave he got his boxes together and left—so the conviction was not well-supported.[11]   As a result, Van Camp opined that the equities of the situation did not suggest that Sims should have had to plead to this

---

[11] Sims took a polygraph in an effort to prove he never had any intent to distribute or disseminate the classified documents (*see, e.g.,* ECF No. 228-1 at 16 (email from Sims' wife referencing polygraph he took "to prove no one ever saw or ever would see the material"); E.H. Gov. Exh. 6 at 3 (letter from Van Camp referring to polygraph results not justifying the conviction and consequences in this case); *but see* ECF No. 228-2 at 27–28 (noting Sims was asked during the polygraph examination whether any unauthorized person directed him to remove the classified material and whether he had intentionally disclosed the material to any unauthorized persons and questioning potential exculpatory explanations regarding such actions, including that the data was possessed merely for "military trophy" purposes)).

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

count (ECF No. 250 at 197).    Counsel also volunteered during the court's questioning that if he was found ineffective he was a big guy and he could "settle it" (ECF No. 250 at 195).[12]

The last witness was attorney John Beroset, who had served as Sims' local counsel.    Beroset testified that he could not recall exactly when the issue of Sims' retirement first came up.    He speculated that it was either when he, Van Camp, and Sims were at the SCIF or when they were eating at a local restaurant, and he could not say who first brought it up (ECF No. 250 at 204).    Beroset told Sims that he should consult with the Air Force to see what they said, and Sims said that he would. Beroset's recollection was that this conversation took place somewhere toward the end of the case (ECF No. 250 at 205, 216–217)

Beroset was then questioned about his email exchange with Sims regarding the retirement benefits question (ECF No. 250 at 206–210).    Beroset testified that his email records were incomplete.    He acknowledged that he had located his email to Sims of June 18, 2014, and that he believed he was responding to Sims' question about his retirement because of the use of similar language.    However, Beroset said

---

[12] The court's notes reflect counsel's remarks as having been slightly different than those reflected in the transcript (i.e., that he could "handle it" if found ineffective), but with the same general meaning.

that he was unable to locate either Sims' original email to him from earlier on June 18, or Sims' follow-up email of June 19 in which he asked for an assessment of the statute.    Beroset also did not recall responding to the latter email and, after checking his "sent responses," had no record of doing so.    Beroset explained that he did not do any analysis of the information he located about the retirement benefit issue; he merely gathered it and sent it back to Sims (ECF No. 250 at 219).    He later learned that the very statute he had provided to Sims, 5 U.S.C. § 8312, was the basis for Sims losing his retirement (ECF No. 250 at 220; *see also* ECF No. 228-1 at 42).

When asked whether he had any further conversations with Sims about the retirement benefits, Beroset's recollection was that Sims reported that he had looked into it that he "thought he would be ok."    Beroset said that Sims had mentioned a case or a person who had been in the news and seemed to base his opinion on that.[13] Sims did not ask Beroset to do anything further, and this conversation, which took

---

[13] The person in question was retired General David Petraeus, who was charged with providing classified data to his mistress.  Petraeus entered into an agreement with the Justice Department pursuant to which he pleaded guilty to one count of unauthorized removal and retention of classified material, a misdemeanor.  Originally, prosecutors were pursuing felony charges which could have sent Petraeus to prison and cost him his pension (*see* ECF No. 228-1 at 11-13; https://www.washingtonpost.com/world/national-security/how-david-petraeus-avoided-felony-charges-and-possible-prison-time/2016/01/25/d77628dc-bfab-11e5-83d4-42e3bceea902_story.html?utm_term=.b2bacf96ec4e ).

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

place after the emails, was the last conversation Beroset had with Sims about his retirement until later (ECF No. 250 at 210).

Beroset denied that Sims had told him (Beroset) that it was Van Camp who advised Sims that his retirement was safe (ECF No. 250 at 211).   He also did not recall Sims telling either Beroset or Van Camp that he would not plead guilty if the retirement was affected.    Beroset said that everyone agreed that pleading guilty was the best thing in light of the "mountain of evidence" and that in light of this evidence Sims had given them permission to engage in plea negotiations with Kunz (ECF No. 250 at 211–212).    Beroset said that counsel did the best they could to get Sims the lowest possible sentence.    When they first gave Sims an estimate of the guidelines range and it was about ten years, Sims told them he could not go to prison that long. Beroset advised Sims that if he entered a guilty plea and did other things, such as take a polygraph, he had a better chance of getting a below guidelines sentence than if he went to trial.    When they reviewed the plea agreement, Sims never said anything about the written agreement not addressing his retirement (ECF. No. 250 at 215).

Beroset learned that Sims' retirement had been discontinued from Sims' wife (ECF No. 250 at 213–214).    He recalled that Mrs. Sims was asking for help, and

that she never said words to the effect that "you told us this wouldn't happen."[14] Beroset noted that either Sims or his wife had asked him to write a letter or email to someone in the military about his retirement, and he did as requested.

Beroset said that Sims called him to warn him that he was planning to file the § 2255 motion (ECF No. 250 at 215).    Beroset's response was something akin to "you got to do what you got to do" (ECF No. 250 at 215).    Beroset said that reading the § 2255 motion was the first time he had seen the allegations regarding Van Camp's alleged assurances to Sims.

On cross-examination, Beroset reiterated that the retirement issue did not come up until later in the case, when, after having reviewed the evidence, the three men were discussing possible consequences of a conviction (ECF No. 250 at 217). The next time the issue came up was in the June 2014 email chain, where Beroset sent Sims the information and relevant statute without analyzing it (ECF No. 250 at 219).

When pressed by defense counsel about whether he had an obligation or duty to his client to ascertain the answer to Sims' question about how a conviction would

---

[14] In fairness, there was no reason for Mrs. Sims to make such a statement at that point, as it took some time for the Sims's to learn the reason the Air Force discontinued Sims' retirement.

affect his retirement, Beroset stated that he thought he had.    He explained that he told Sims what Sims needed to do, although Sims apparently never did it; that he (Beroset) did research and gave it to him; and that Sims told Beroset that he thought he would be fine (ECF No. 250 at 222).    Beroset noted that Sims never asked Beroset to do anything else for him until Sims was in the BOP, and that Beroset continued to do work for him then.

Beroset testified that he was not aware of the ABA and NLADA standards regarding defense counsel's obligation to learn of and advise the client of collateral consequences of a conviction (ECF No. 250 at 223).    He again admitted that he had not done a thorough analysis of the statute that ultimately resulted in Sims losing his retirement or consulted an expert.    He explained his reluctance to give an opinion was because, in his experience, dealing with Government agencies could be tricky (ECF No. 250 at 224).    Beroset did not recall any conversation with Sims about the retirement when Van Camp was present, other than the initial conversation.

## ANALYSIS

Timeliness

The Government first contends that Sims' motion, filed almost two years after his sentencing, is untimely. Title 28 U.S.C. § 2255(f) imposes a one-year time

limitation on the filing of motions under this section. The one-year period of time

runs from the latest of:

> (1) the date on which the judgment of conviction becomes final;
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the petitioner was prevented from making a motion by such governmental action;
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

In his motion, Sims asserts that his claim is timely filed pursuant to 28 U.S.C.

§ 2255(f)(4).   He filed the motion pursuant to the prison mailbox rule on October

18, 2016, which was within one year from November 1, 2015, the date on which he

first learned his retirement benefits had been suspended.

The Government does not dispute that after Sims' October 28, 2014

sentencing, he continued to receive his retirement pay through October of 2015.

The Government's suggestion that Sims' claim "could have been discovered" earlier

and that he should have exercised due diligence before his plea to ascertain the status

of his retirement benefits is not well taken.   The crux of the instant claim is that

counsel provided what ultimately proved to be false or inaccurate assurances about

Sims' retirement benefits.    When Sims continued to receive his retirement pay as expected, he had no reason to conduct any further investigation about this issue or file the instant motion.    The court finds that Sims' motion was timely filed pursuant to § 2255(f)(4).

### General Standard of Review

Collateral review is not a substitute for direct appeal, and therefore the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited.    A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack.    *See* 28 U.S.C. § 2255(a); *McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011).    "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'"    *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted).    The "fundamental miscarriage of justice" exception recognized in *Murray v. Carrier*, 477 U.S. 478, 496 (1986), provides that it must be

shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent . . . ."

The law is well established that a district court need not reconsider issues raised in a section 2255 motion which have been resolved on direct appeal. *Stoufflet v. United States*, 757 F.3d 1236, 1239 (11th Cir. 2014); *Rozier v. United States*, 701 F.3d 681, 684 (11th Cir. 2012); *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000); *Mills v. United States*, 36 F.3d 1052, 1056 (11th Cir. 1994). Furthermore, because a motion to vacate under section 2255 is not a substitute for direct appeal, issues which could have been raised on direct appeal are generally not actionable in a section 2255 motion and will be considered procedurally barred. *Lynn*, 365 F.3d at 1234–35; *Bousley v. United States*, 523 U.S. 614, 621 (1998); *McKay v. United States*, 657 F.3d 1190, 1195 (11th Cir. 2011). Ineffective assistance of counsel claims are generally not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal. *Massaro v. United States*, 538 U.S. 500, 503 (2003); *see also United States v. Franklin*, 694 F.3d 1, 8 (11th Cir. 2012); *United States v. Campo*, 840 F.3d 1249, 1257 n.5 (11th Cir. 2016).

In order to prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Williams v. Taylor*, 529 U.S. 362, 390 (2000); *Darden v. United States*, 708 F.3d 1225, 1228 (11th Cir. 2013). *Strickland*'s two part test also applies to guilty pleas. *Lafler v. Cooper*, 566 U.S. 156, 162-63 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)). A defendant will be required to show that but for counsel's errors, he would not have pleaded guilty and would have instead insisted on proceeding to trial. *Id.* at 163 (quoting *Hill*, 474 U.S. at 59). A defendant's "after the fact testimony concerning his desire to plead, without more, is insufficient to establish" prejudice. *Pericles v. United States*, 567 F. App'x 776, 782 (11th Cir. 2014) (quoting *Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991)); *Rosin v. United States*, 786 F.3d 873 (11th Cir. 2015). A defendant must "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010). In applying *Strickland*, the court may dispose of an ineffective assistance claim if a defendant fails to carry his burden on either of the two prongs. *Strickland*, 466 U.S. at 697; *Brown v. United States*, 720 F.3d

1316, 1326 (11th Cir. 2013); *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("[T]he court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688; *see also Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). Reviewing courts are to examine counsel's performance in a highly deferential manner and "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Hammond v. Hall*, 586 F.3d 1289, 1324 (11th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689); *see also Chandler v. United States*, 218 F.3d 1305, 1315–16 (11th Cir. 2000) (discussing presumption of reasonableness of counsel's conduct); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). With regard to the prejudice requirement, defendant must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be

substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (quoting *Strickland*).

Direct vs. Collateral Consequences

Sims' claim is not the typical ineffective assistance of counsel claim challenging the fact of his conviction or the length of his custodial sentence. Instead, he contends that his Sixth Amendment right to effective assistance of counsel was violated because Van Camp provided affirmative misadvice about the consequences a conviction would have on Sims' military retirement benefits. He simultaneously or alternatively claims that both of his attorneys failed to conduct reasonable investigation into this issue.

The degree of counsel's duty depends to a great extent on whether the loss of retirement pay was a direct or collateral consequence of Sims' conviction. Sims argues that the loss of benefits was a consequence that flowed automatically from his conviction, and hence it was a direct consequence. The Government's position, that it is a collateral consequence, is correct.

A collateral consequence is one that is outside the control of the sentencing court, even if it is a "definite" consequence of the conviction. *Padilla v. Kentucky*, 559 U.S. 356, 364–65 (2010); *United States v. Nicholson*, 676 F.3d 376 (4th Cir.

2012); *United States v. Gonzalez*, 202 F.3d 20, 27 (1st Cir. 2000); *Moore v. Hinton*, 513 F.2d 781, 582 (5th Cir. 1975). Before the *Padilla* decision, ten federal appellate courts had concluded that "counsel's failure to inform a defendant of the collateral consequences of a guilty plea is never a violation of the Sixth Amendment." *Chaidez v. United States*, 568 U.S. 342, 351 & n.7 (2013) (quoting *Santos-Sanchez v. United States*, 548 F.3d 327, 334 (5th Cir. 2008)). In *Padilla*, the Court essentially held that "deportation is different," noting that it was "uniquely difficult to classify as either a direct or a collateral consequence." *Padilla*, 559 U.S. at 366. Still, the Court did not "eschew the direct-collateral divide across the board." *Chaidez*, 133 S. Ct. at 1112. Thus, post-*Padilla* counsel is not constitutionally remiss if he fails to advise his client of collateral consequences of his plea, other than deportation. *See, e.g., United States v. Reeves*, 695 F.3d 637, 640–41 (7th Cir. 2012) (holding that counsel did not perform deficiently by failing to advise client that a guilty plea could result in a later sentencing enhancement).[15]

The loss of federal benefits as the result of a criminal conviction is a collateral consequence of a conviction, rather than a direct consequence. *United States v.*

---

15 As discussed more fully below, <u>failing to advise</u> of a collateral consequence is different—and is analyzed differently—than <u>providing affirmative misadvice</u> about a collateral consequence.

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

*Morse*, 36 F.3d 1070, 1072 (11th Cir. 1994); *see also United States v. Nicholson*, 676 F.3d 376, 381–82 (4th Cir. 2012) (holding that court did not err in failing to inform defendant about loss of government benefits, which was a collateral consequence of his guilty plea).    Military courts which have considered this issue have reached the same conclusion.    *See United States v. Sumrall*, 45 M.J. 207, 210 (U.S.C.A.A.F. 1996) (holding that loss of benefits under § 8312 is one of several "consequences . . . beyond our jurisdiction"); *United States v. Allen*, 33 M.J. 209, 215 (U.S.C.M.A. 1991) (noting that "[b]ecause the [forfeiture of pay under § 8312] was collateral to these proceedings, it was not part of his sentence and thus was beyond the grant of power in Article 67, U.C. M.J., 10 U.S.C. § 867").[16]    The loss of retirement pay, while of great significance to Sims, was a collateral consequence of his conviction.

ABA standard 14-3.2(f), referenced by defense counsel at the evidentiary hearing, provides that "to the extent possible, defense counsel should determine and advise the defendant, sufficiently in advance of the entry of any plea, as to the possible collateral consequences that might ensue from entry of the contemplated

---

[16] The court notes the Government's analysis of how the threat of reduction in or loss of retired pay for certain convictions furthers the mission of maintaining the readiness of the military (ECF No. 228 at 33–35).

plea" (E.H. Def.'s Exh. 6 at 8).    Similarly, the Performance Guidelines for Criminal

Defense Representation of the National Legal Aid and Defender Association

("NLADA") contain a provision stating that "counsel should be fully aware of, and

make sure the client is fully aware of . . . other consequences of conviction such as

deportation and civil disabilities" (E.H. Def.'s Exh. 7 at 6).    These "prevailing

norms of practice" are merely guides to determining what is reasonable.

*Strickland*, 466 U.S. at 688; *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).    "[T]he

purpose of the effective assistance guarantee of the Sixth Amendment is not to

improve the quality of legal representation . . . [t]he purpose is simply to ensure that

criminal defendants receive a fair trial."    *Strickland*, 466 U.S. at 689.    Thus, the

ABA standards and NLADA guidelines are more akin to aspirations that, at least in

some respects, exceed the threshold minimum standard of representation required

by *Strickland* and its progeny.    Sims' argument, in essence, urges this court to

depart from precedent and find that advice regarding a loss of military retirement

benefits "is not categorically removed from the ambit of the Sixth Amendment right

to counsel."    *Padilla*, 559 U.S. at 366.    Even if the interplay between 5 U.S.C.

§ 8312 and 18 U.S.C. § 793 appears plain from the face of the two statutes, at least

to an individual trained in the law, case law does not unequivocally support a finding

that there was a constitutional requirement that counsel apprise Sims of the collateral consequences of his guilty plea.

The fact that Sims directly asked his counsel about this issue has the potential to shade the analysis, albeit slightly.   However, in lieu of parsing hairs, the better course is to examine the second part of his ineffective assistance of counsel claim, regarding affirmative misadvice.

As the Government recognizes, the performance of an attorney who provides affirmative misadvice about the collateral consequences of a conviction can be constitutionally infirm.   The defendant need "not correctly assess every relevant factor entering into his decision" whether to plead guilty.   *Brady v. United States*, 397 U.S. 742, 757 (1970).   However, erroneous advice may distort the defendant's decision-making process, because "certain considerations are so important that misinformation from counsel may render the guilty plea constitutionally uninformed." *Downs-Morgan v. United States*, 765 F.2d 1534, 1541 (11th Cir. 1985) (deportation).   In *Lee v. United States*, 137 S. Ct. 1958 (2017), referenced *supra*, the Supreme Court found that an attorney who affirmatively provided misadvice about the deportation consequences associated with a conviction

performed deficiently, because the erroneous advice affected Lee's understanding of the consequences of pleading guilty.

Sims claims that his retained attorneys were constitutionally ineffective because their affirmative misadvice regarding the consequences of a conviction under 18 U.S.C. § 793(e) (Count 34) rendered his plea involuntary and unintelligent as to that offense.   Whether he was affirmatively misadvised is a question of fact that depends on this court's analysis of the evidence presented and assessment of the credibility of the witnesses at the evidentiary hearing.

As set forth above, Sims testified that Van Camp told him the Government would not be "going after" his retirement.   Van Camp testified that retirement never came up during his initial meeting or any of his meetings with AUSA Kunz, and that he never told Sims otherwise.   There was no witness to the conversation that occurred between Van Camp and Sims just after Van Camp's initial meeting with Kuntz.   While Van Camp appeared fairly certain of what he had said, after considering the testimony as a whole and observing the demeanor of the witnesses, the court finds Sims' testimony, which was corroborated by his subsequent actions, to be more credible.

Sims drove Van Camp to and from his meeting with Kunz, following which Van Camp reportedly relayed this information to him. Whether Van Camp purportedly learned this directly from AUSA Kunz or Van Camp extrapolated it from the conversation is of no moment. Sims' confidence, at least initially, in what Van Camp had told him was supported by the testimony of multiple friends and family members who relayed that Sims had told them, at different times and under different circumstances, that his retirement was not in jeopardy. Sims' daughter and parents testified that Sims told them what his lawyer, rather than anyone else, had said, and everyone saw this as a bit of reassurance at a dark time.

Van Camp repeatedly testified that he considered Sims' retirement benefits to be merely "a factor" in the case. To Sims, the preservation of his retirement benefits was the only bright spot in a seemingly dire situation, and his interest in recalling and understanding what counsel had said was heightened. Van Camp's recollection may have been clouded by the fact that, according to Sims, Van Camp was not feeling well that week, and even fell asleep multiple times while the two men were reviewing documents in the SCIF.

Van Camp testified that he told Sims in the SCIF, with Beroset present, that the count dealing with classified information "did carry aspects of a retirement —

forfeiture of retirement," and this was a factor to be considered (ECF No. 250 at 166). The fact that Van Camp was on notice that there was a potential issue lends credibility to Sims' version of events, that the issue could have come up during Van Camp's meeting with Kunz.

The court notes that, while Sims felt comfortable enough with Van Camp's representation to share this information with his family, he nonetheless emailed both lawyers on June 18, 2014, in part, to request a "definitive answer" about his retirement. The fate of Sims' retirement benefits was not the only question posed in the email, and the fact that Sims' made the inquiry at all is arguably consistent with Ms. Ulrich's observation that it was Sims' nature to want as much information as he could get. Furthermore, the fact that the Government was not "going after" his retirement was not necessarily the same thing as saying that it "could not" do so. Sims apparently read the material that Beroset provided and specifically asked for counsel's assessment of 5 U.S.C. § 8312, noting that it did not appear that he was being charged under that statute and asking if he was reading that correctly. Neither attorney responded, and Sims did not follow up, perhaps taking silence to be an affirmation but, in any event, proceeding without an answer. In sum, the court does not find that Sims' request for written information about how a conviction

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

would affect his retirement discredits his testimony about what Van Camp told him after Van Camp's meeting with Kunz.

Finally, in addition to Sims' credible understanding of Van Camp's initial statement, Sims' wife also testified about leaving a later meeting she and her husband had with Van Camp, knowing that her husband would be going to prison but they "had the retirement."

The parties agree that 5 U.S.C. § 8312 provides that the loss of retirement annuities is the automatic result of a conviction of a violation of 18 U.S.C. § 793 (although Van Camp testified that an Air Force representative had advised him that the Air Force might have some discretion). Beroset provided Sims a copy of the statute, in apparent response to Sims' email inquiry, but simultaneously stated he was "not comfortable" providing Sims with a definitive answer. The Government's position now is that § 8312 is so clear that Sims should have been able to figure out that his benefits were in jeopardy, despite what he had been told. This begs the question of why, if this is the case, a seasoned attorney could not have done the same. Sims argues, with the wisdom of hindsight, that § 8312 was "clear, succinct and explicit" (ECF No. 212 at 14). At the relevant time, however, Sims, as a layperson, was confused because he had not been charged under 5 U.S.C. § 8312

(E.H. Def's Exh. 3 at 2).    He reached out to counsel for additional clarification but never received advice one way or the other.    Thus, he was left with the erroneous advice and assurances he (and his wife) had previously been given by Van Camp.

Prejudice

In order to be entitled to relief, Sims must clear a second hurdle.    He must establish that he was prejudiced by counsel's alleged affirmative misrepresentation.

The Supreme Court's recent decision in *Lee v. United States* is instructive with respect to prejudice.    *Lee,* 137 S. Ct. 1958 (2017).    In *Lee*, the defendant was a South Korean national who came to the United States with his parents when he was thirteen years old.    He remained for thirty-five years as a lawful permanent resident, without either becoming a United States citizen or returning to South Korea.    After his indictment for possession with intent to distribute ecstasy, Lee told his retained counsel about his non-citizen status and repeatedly asked whether he would face deportation as a result of the criminal proceedings.    Based on counsel's assurance that he would not be deported, Lee entered a plea of guilty and was sentenced to a year and a day in prison.    Lee pursued § 2255 relief when he learned that, contrary to counsel's assurances, he would be deported after serving his sentence.

At an evidentiary hearing, both Lee and his plea-stage counsel testified that "deportation was the determinative issue in Lee's decision whether to accept the plea."    Lee's counsel further testified that Lee's defense to the charges was weak, but had he known that Lee would be deported upon pleading guilty, he would have advised him to go to trial.    The reviewing magistrate judge recommended that Lee's plea be set aside and his conviction vacated.    The district court declined to adopt the recommendation but issued a certificate of appealability.

The Sixth Circuit affirmed, finding that although Lee's attorney had performed deficiently, Lee could not show prejudice.    It stated that Lee had no bona fide defense, and cited circuit precedent holding that "no rational defendant charged with a deportable offense and facing overwhelming evidence of guilt would proceed to trial rather than take a plea deal with a shorter prison sentence."

The Supreme Court held that counsel's deficient performance led not to a "judicial proceeding of disputed reliability," but rather to the forfeiture of an entire proceeding to which Lee had a right.    *Lee,* 137 S. Ct. at 1965 (citations omitted). Lee's prospects of an acquittal were admittedly grim.    The Court nonetheless found credible Lee's position that had he known he would be deported upon conviction, he never would have accepted a guilty plea.    Rather, he would have gambled on trial,

risking the possibility of more jail time for whatever small chance there might be of an acquittal that would let him remain in the United States.    *Lee*, 137 S. Ct. at 1966. The Court contrasted Lee's situation with that of a defendant who attempted to make a similar argument regarding the importance of parole eligibility because the latter defendant was unable to show that he placed particular emphasis on his parole eligibility.    *Hill v. Lockhart*, 474 U.S. 52, 60 (1985).    The Court framed the dispositive question as not how a hypothetical trial would have played out, but rather whether absent the error and with proper advice there was an adequate showing that the defendant would have chosen to go to trial.

*Lee* is both analogous to and distinguishable from the instant case.    The record in *Lee* unequivocally supported a finding that Lee would not have pleaded guilty had he known about the certain deportation consequences of a conviction. The record is less clear here, but still supports a finding in Sims' favor.    Unlike Lee's lawyer, Sims' attorneys testified that they did not recognize that Sims' desire not to lose retirement benefits was paramount.    Arguably, however, after Van Camp's representation to Sims in June of 2014, that the Government was not going after his retirement, Sims had no need to articulate or reiterate the importance of his retirement if he believed losing it was not an issue.    Sims alleged in his § 2255

motion that he "adamantly" told counsel he would not enter a guilty plea, although he receded somewhat from this position at the hearing.    According to testimony adduced at the hearing, Sims had multiple concerns relative to the prosecution.    In addition to his retirement, he was concerned about the length of his prison sentence, protecting his family, and by some accounts, protecting the integrity of the information at issue.

Counsel both stated in their affidavits that the evidence against Sims was overwhelming, and they would have advised Sims to plead guilty even if they had known that he would lose his retirement benefits (ECF No 228-1 at 7; ECF No. 229-1 at 7).    The Government did not credit Sims' position that the documents found in his possession were "military trophies" due to the nature and volume of classified information recovered, as described by Special Agent David E. Wodushek of the United States Air Force Office of Special Investigations (ECF No. 228 at 12, citing ECF No. 228-2 at 27–28 ¶ 6).    As stated in *Lee*, however, the mere fact that Sims' prospects of acquittal on a particular charge were grim does not mean that it would be irrational for him to take a risk for something of such importance to him.

Despite the volume of evidence recovered, Sims argued in his reply that he believes 18 U.S.C. § 1924 more accurately depicted the criminal conduct covered

by Count 34 (ECF No. 236 at 12).   In support of this position he notes that (1) he had no nefarious intent with respect to the retention of the material, and (2) there was no evidence that he had shared or had the intent to share classified material. Sims conceded that his actions were "inexcusable and unlawful" but asserts that they did not merit a conviction under the Espionage Act.

Sims concluded his testimony at the evidentiary hearing by reiterating that if he had found out that he would have lost his retirement by pleading guilty to Count 34 there was "no way [he] would have pled guilty to that count" (ECF No. 250 at 156).   He said "If I had to go over all the counts to know that my retirement would be safe and my wife's medical could be safe for the rest of her life, I would have gone to trial" (ECF No. 250 at 157).   Sims acknowledged he would have pleaded guilty to the counts he thought were commensurate with what he did, but not Count 34, the espionage count.   Therein lies the "prejudice."

Conclusion

The undersigned is not privy to the abundant classified information that was made known to the district court during the pendency of these proceedings. However, Sims' patriotism and long history of service to this country, despite his unlawful acts, is undeniable.   In light of the family's sacrifice for Sims' career,

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT

particularly Mrs. Sims, who was unable to obtain tenure or retirement due to frequent moves in support of her husband's career, Sims' characterization of the retirement as belonging to the family is not unfair.

The court respects the expertise of the two seasoned attorneys who handled Sims' defense, and recognizes the tremendous hurdles they faced defending a complicated case involving highly classified information.   It also recognizes the significant gains made during plea negotiations where counsel were able to secure a plea agreement to only five of the charges set forth in the indictment and, of course, that while represented by these attorneys Sims received a sentence that was well below the applicable guideline range.

Nonetheless, the court is convinced that the greater weight of the evidence establishes that Sims' decision to accept this plea was influenced by affirmative misadvice about the collateral consequences of the plea.   Specifically, Sims believed, as a result of statements made by Van Camp and furthered by the attorneys' lack of investigation, that entering a plea of guilty would not place Sims' military retirement and his family's health benefits in jeopardy.   Absent this erroneous information, notwithstanding contrary advice of counsel, Sims testified and averred

that he would not have been willing to enter a plea of guilty to Count 34 of the indictment.

Recognizing that Sims' plea was part of a negotiated package, the court asked the parties to submit argument after the evidentiary hearing and to address appropriate remedies. Neither party's brief contains any argument or legal citation but both agree that if the court found that Sims is entitled to relief, the appropriate remedy would be to allow Sims to withdraw his plea on Count 34 alone, without prejudice, leaving the remainder of the agreement intact.

In its response, the Government further indicates that its intent would be to pursue its case against Sims on Count 34, but not to seek reinstatement of the dismissed charges. This relief would place Sims in the same position he would have found himself in had he pleaded guilty to the other charges contained in the plea agreement and proceeded to trial on Count 34.[17]

---

[17] The court notes only for the district court's consideration that the Government stated in its original reply that there is no evidence that the Government would have offered Sims a plea allowing him to avoid conviction on Count 34 (ECF No. 228 at 44), and that Van Camp testified that he unsuccessfully attempted to negotiate a plea agreement without this count of conviction. It appears from Van Camp's testimony that the Government would also have not agreed to a plea to a lesser offense on Count 34—one which would permit Sims to retain his military retirement benefits and which, in Sims' view, more accurately reflects the misconduct he committed with respect to that count—but it also appears that Van Camp might not have directly asked for such, as he testified that AUSA Wallace was becoming perturbed over his persistence in plea negotiations as to Count 34, and it seemed to Van Camp that Wallace was not simply unwilling to

Based on the foregoing, it is respectfully **RECOMMENDED**:

The motion to vacate, set aside, or correct sentence (ECF No. 212) be **GRANTED** to the extent that Sims be allowed to withdraw his guilty plea as to Count 34 of the indictment.

At Pensacola, Florida, this 4<u>th</u> day of January 2018.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636**.

---

negotiate with respect to Count 34 (*see* ECF No. 250 at 170–171).

Case Nos.: 3:13cr77/LAC/EMT; 3:16cv593/LAC/EMT